This is In Re. Marriage of Joni L. Lawson and Jeffrey T. Lawson, 4090695. We have for the Appellant, Michelle Mosby-Scott, and for the Appellee, Alice Smalling. Miss Mosby-Scott. Good morning. May it please the Court and Counsel, Smalling. My name is Michelle Mosby-Scott. I represent the Appellate, Jeffrey Lawson. Thank you for giving us the opportunity to be heard this morning. There are three issues that are the subject of the appeal that I would like to be discussing this morning. Those three issues include, first, whether or not the removal that was granted by Judge Suk was appropriate and in the best interest of the four minor children. The second of which is whether or not, if the Court determines that a removal should be affirmed, whether the parenting schedule was reasonable in light of the circumstances that exist both in Arkansas as well as my client's circumstances and work requirements here in Illinois. The third of which involves a modification of the marital settlement agreement in regard to obligations that the parties had negotiated and agreed upon, which was subsequently modified by Judge Suk during the removal proceedings. What was the proposed visitation that you had proposed? Proposed visitation, if removal was granted, was that the children would spend every third weekend with their father. My client is a fireman, and so as a result thereof, he has a unique schedule. He works 24 hours on and 48 hours off. There is some substantial testimony in regard to having some ability, after so many hours of credit, being able to take some personal time if it's approved and if there are others who can cover his shift. But for the most part, it is 24 hours on and 48 hours off. He is guaranteed almost every third weekend, but in order to make a regular visitation schedule work,  But the problem is there is no direct flight to this town in Arkansas, correct? That is correct, and in fact the testimony was by mother that ground transportation would be utilized by her. She would not be utilizing flight transportation, and because of the cost issues, if transportation was going to be a contribution to expense, was going to be required by my client, my client indicated that he would most likely be required to use ground transportation because of the cost of airfare for four children and the likelihood that a parent would have to accompany. So more likely than not, whatever transportation or exchange, it would require ground transportation. The travel schedule, however... You said every third weekend, you mean every third weekend in addition to what the trial court granted? Yes, and this is a parenting schedule, and I know these cases are difficult because we can find any case in the fourth district really to support a removal or to deny a removal, and it is very much fact-based. This particular case I think is unique, not only because of the work history for father and his occupation as a fireman, but also the company for which the stepfather runs out of his home, but more importantly I believe the impact and the interaction that my client had with his children. The guardian item in his report identified in the testimony was clear that even though my client was a fireman, that on average there was five out of seven days where he had interaction with his children. Now, that didn't mean that he had five overnights out of every seven, but the testimony was that he attended gymnastic events, gymnastic practices. He went on outings with the children.  He was actively involved with two out of the four children in regard to softball, both in regard to coaching and attending. And so the reality is plucking four children out of Illinois and removing them to Arkansas, even if you afforded them the schedule that we were requesting, it would never be a replacement schedule. But the question then becomes would it have been a reasonable schedule to foster the relationship that he had with the children when they were here? We believe the answer to that query is no, it would not have been. But more importantly, look at... Isn't the problem for the trial judge the fact that she was going to move to southern Illinois at a minimum? Well, I think that goes to motives and whether or not the removal was to some extent created as a ruse, because the GAL made it very clear when he interviewed the children, the children were instructed by mother, they didn't have three choices, they had two choices. You can either move to Arkansas or you can move to Cairo, Illinois. You can move to southern Illinois. And those are your choices. The option is not whether or not we're staying here in Bloomington. I think that that really creates a difficulty for four children. Four children when, as of today's date, are 14, 11, 8, and 5.  But as of today's date, based on the birth dates and the record, they're 14, 11, 8, and 5. Now this is a mother who said, you can move to Cairo, a place you've never been to, you know nothing about, because I have the ability to move you within the state, which I don't believe is completely true. These folks had a joint parenting agreement that was entered on April 18th of 2008. Mother was the residential parent. However, that agreement required that the parties were to confer and agree on education, moral, religious, standards of conduct, training, travel, health care, and what we see in joint parenting agreements. They had to confer and agree. So I don't believe she could have unilaterally moved them to Cairo without reaching an alternative visitation schedule, which the court would have had to put its stamp of approval on. Otherwise, had she have done that, she would have been in contempt of court in regards to the joint parenting agreement. But the joint parenting agreement did not specifically say they had to agree on residence. The joint parenting agreement did not say she had to live in a particular area. That is true. It didn't restrict her whereabouts as to where she could live. And obviously, as the court is aware, that's a difficulty as well, because too many restrictions in a joint parenting agreement in regard to mobility can cause difficulties in regard to passing muster with the appellate court as well. And was there a motion for stay of this removal? There was not a motion for stay of the removal because what the court did is the court granted removal but did not enter a final order of visitation. Judge Sue granted removal, did not rule on visitation, said I'm sending the parties to try to work out an agreement on visitation. Even after we'd spent several days in trial. Parties could not work out an agreement on visitation, came back and had some testimony. The judge subsequently then ruled in regard to visitation issues by the time the visitation order on removal occurred, the children were already in Arkansas and the appeal was filed almost immediately thereafter. But to answer your question, I guess in short, no, there was no stay. Did she have permission pursuant to that first order to remove the kids? There was a docket entry made by the court that the petition was granted. But isn't a written order required? Not per Judge Sue. She was allowed to move by his docket order even though there was not a ruling on visitation. So when the matter was completed and visitation was ordered, there was already a ruling. And if you notice and you look at the record, Justice Myers-Kauf, you will see that, in fact, before the written order, I believe, was entered on the visitation, there was already a notice of appeal pending. What brings us back to the issue in regard to removal is if you reverse a court's ruling in regard to removal, these children will be returned back to Illinois. Parties still have the home that they lived in, still have the home that they lived in, because the marital settlement agreement required it to be put on the market for sale. The interesting factor, factually in this case, that I think sets it apart from almost every other case you've ruled on in removal, which was poignantly identified by the guardian ad litem, which I think was completely ignored by Judge Sue, is Mr. McNabb, who is the stepfather in this case. He was a partner in an advertising business. In their exhibits, which I'm sure the court has seen, that were provided to the trial court, that he was the technological go-to guy. All of the work that he did was done out of his home. His partner reported that his partner was what they referred to as the press of the flesh. His partner met clients, went out on site. Periodically, Mr. McNabb also had to go out and meet a client, put in what they referred to as FaceTime. His partner said that occurred maybe once a month, and that he had to travel approximately to conferences or seminars two times per year. Now, Mr. McNabb, on the stand, testified that his home was technologically set up so that these children could have webcam communication with their father, email communication with their father, and that was going to be a substantial replacement for the FaceTime that these children were going to get with their father in Illinois. However, he testified also, well, that's not a good enough replacement for the once a month FaceTime I have to give with my clients, and it wouldn't be appropriate for me to travel two times a year from Bloomington, Illinois, to go to Arkansas or to seminars or conferences in other areas of the state to meet my business obligations. The court's finding was simply that it didn't have enough evidence about Mr. McNabb's business to disprove what Mr. McNabb said, which was, I'm not moving. I'm not going to try moving. I'm not going to move the technological equipment to Bloomington because I'm not going to put my business at risk. I'm not going to consider it. I'm not going to do it. I don't believe it would work. And my position is, Your Honors, if you look at the case law, now, does Mr. McNabb have to tell his partner, I'm not going to be in partnership with you anymore? No. But he does have to make some type of a diligent effort to see whether or not, in the best interest of these children, he could operate a business from Illinois. What case says that, that it's required to make a diligent effort? I have provided in my brief, and I'm going to refer you to a number of cases. For example, in Ray Marriage of Parr, the court allowed removal, but in its finding indicated that they were allowing removal, and they made a finding that they were allowing removal after determining that a thorough job search had been made by the requesting party. In Ray Marriage of Ledwenski, failure to seek employment in Illinois is a factor that the court should consider before removal is to be granted. In regard to Mr. McNabb's circumstances, the court determined that Mr. McNabb's refusal to try it wasn't a basis in his consideration, because the court wasn't in any better of a position than Mr. McNabb to determine whether it would work or not. The GAL, in his report to the court, specifically said, after speaking to Mr. McNabb's partner, and I believe this is on page 14 of my brief, it's from the GAL's testimony, the GAL reported that he believed that it would be inconvenient for Mr. McNabb to move equipment from Arkansas to Illinois, but he could maintain his same level of involvement in his partnership from Illinois as he did when he was in Arkansas. The GAL also indicated that children don't want to move to Arkansas. They want Mr. McNabb to move here. The GAL reported to the court that Mr. McNabb's partner doesn't want to terminate the partnership, that he wants to continue the partnership and would consider other alternatives other than them remaining in Arkansas. He obviously doesn't want his partner... How much deference is the trial court to give to the opinion of the GAL, according to the case law, if any? Well, the case law says that the GAL report is a factor for the court to consider. It is not determining. The court does not have to follow the recommendation of the guardian ad litem, but it is a factor that the court should consider. In this particular case, I don't believe that the court considered the GAL's recommendation at all. There's no reference to the GAL in regard to Judge Suk's ruling at all, except to say that Judge Suk did say and made a reference that he was going to accept Mr. McNabb's representations, that it just wouldn't work and he wasn't going to require that he try it. But there was no accepting of or consideration of the guardian ad litem's recommendations or the guardian ad litem's findings. Guardian ad litem met with each of the children, I believe, on at least two occasions. Did a voluminous report in regard to the findings. Made a recommendation to the court. Gave concerns to the court in regard to, you know, what had been postured to the children of, you know, the pressure that they had been put in, and you're going to move to Cairo or Arkansas, pick one. So the GAL gave some pretty detailed information to the court, none of which I believe was considered or relied upon. Judge Suk wasn't required to follow the recommendation of the GAL, but I do believe that he's required to consider it and that a lack of consideration of the report in light of the ruling certainly leads me one step closer to suggesting to this court that it was reversible error. It sounds like to me he considered it, he just rejected it. But nowhere in his report does he assess any of the recommendations of the GAL regarding the children's preferences not to go. Nowhere does he assess the statute under best interest requires we consider the children, you know, their acclimation to home, school, community, where their families are, all of which were identified by the GAL favoring a denial of removal, all of which were provided by the evidence. The only family in Arkansas other than Mr. McNabb was Mr. McNabb's deceased wife's family, and they lived in the Georgia area, which is in close proximity to Arkansas, but certainly not in the immediate locale. All of the other family and support system for the Lawson children are in the Bloomington Normal area. That includes family both for Mr. Lawson as well as the children's mother, all of which there was testimony that the aunts, the uncles, the grandmothers, the grandfathers actively involved in these children's lives, seeing them on a regular basis, good relationships. So what has happened by the removal is not only have these children been removed from their father, which is I believe the most important factor, their stepmother, but all of the other support system that they've grown accustomed to through the entirety of their lives. Is it your client's position that the children would be better off in K-Road versus Arkansas? No. My client's position is not that. Well, if those are the only two options. Those aren't the only two options, Your Honor, because before... I thought you'd been arguing that that's what the position of the custodial parent was. There are two options. It's K-Road or Arkansas. That was the position of the custodial parent as it was presented to her children. But that is not, I believe, the legal options that were available to the children. I don't believe that she could have removed them to K-Road without modifying the order, without being in contempt of the joint parenting agreement. The options were, at the time of the hearing, that they would go to Arkansas if leave for removal was granted, or if that was denied, they would stay in Illinois. If they were to stay in Illinois, Mother would have had to have filed a petition to modify a visitation schedule to allow them to relocate to an area which would have resulted in something less than the reasonable visitation schedule that he was given under the order, which the case law says is every other weekend at a minimum. That would be a non-restricted visitation schedule. So she thwarted to the children that that was the option, but those were not the legal options. And I think it's inappropriate to tell minor children that those are your choices when those are not your legal choices. And then GAL tried to obviously share with the children what the issues were, but only to the extent that it would be appropriate under the circumstances. And Judge Suit did not ask the children the preference, correct? No. No. And so the only evidence in regard to preference would be the information that was provided through the guardian ad litem. As it relates to the issue in regard to the marital settlement agreement, there simply is no authority provided in case law or by statute that would allow a judge on a removal petition to modify a property settlement agreement to provide additional obligations in regard to paying utilities and a mortgage obligation. But doesn't 750-IL-CS-5-510-E say that there are conditions which justify reopening of the judgment? Yes. And case law that would warrant that would be if a property settlement agreement was signed under duress or coercion or if there was an unknown entity or asset that was not disclosed in discovery or was unknown to one party or the court. None of that existed here. But they didn't know she was going to remarry and want to move to Arkansas. Well, but if that's the case, Your Honor, every case when people negotiate a property settlement agreement and subsequently there's a removal petition requested and we've agreed that a house is going to be sold, then you could subject a client subsequently to paying half of a mortgage that they don't get the benefit of living in. Did you object to that concept? I thought your client had a proposal that they listed with a realtor. My client proposed that the property be listed with a realtor because the property settlement agreement said that the property would be sold and that she would live in it with the children until it was sold and that she would be responsible for the expenses. And I'm summarizing the language, but it said that she would be responsible for the expenses except for the expenses they agreed upon related to the sale of the marital residence. So my client already understood it was going to be sold. So he didn't suggest anything different than what was already agreed? No. Right. Okay. Thank you, Ms. Goldstein. Thank you. Ms. Smalley? Can I please go to counsel? With regard to the issues that has been brought up by the appellant in this matter with regard to Google being in the best interest, I do believe that the trial court made an accurate decision in this, looked thoroughly at all the case law that is pending, specifically in the fourth district, did an accurate and thorough assessment of those factors as it applies to the Lawson case, which is supported by his oral ruling, which is found in Volume 7 starting at page 201. Well, is Ms. Mosky-Scott correct that in Carr and Lewinsky, this fourth district actually made its decision based on one of the parents' refusal to seek employment in Illinois? Lewinsky, I believe, was a factor more that the visitation couldn't be drafted to preserve the relationship between the noncustodial and the children. I think that's her other argument. I don't think that the visitation here does foster that. Well, the court in other cases have also said that the visitation doesn't have to be perfect. It has to be reasonable and realistic. And that's what the trial court felt, given the location where Amir's... Well, what's unrealistic or unreasonable about Mr. McNabb, since he does most of his work on the computer, setting up shop in Illinois, and then traveling to Arkansas a couple times, maybe four or five times a month? I don't see why that's unreasonable or unrealistic. It was unrealistic, according to Mr. McNabb's testimony. Well, I read the briefs, and all I got out of it is he says, I'm not doing it. Well, the testimony was that he's been in this same advertising business for over 20-plus years. He has lived in this area for that length of time. His customers and his clients of his business are the same ones, a couple of them. He's been serving for 20-plus years. There was a prior partnership that he was in with three partners, he and two others, that did have to, because of that relationship, they did have to file bankruptcy. Two of those partners are now the ones in the new partnership. They have been able to continue that relationship with those customers. He has, because of the bankruptcy, if he had filed that and moved up here, his finances would be restricted. He has, since the bankruptcy and prior to the trial, purchased a second home because he had such a great relationship with the banking community. He is tied to that community. He has the contacts. Yes, I did read all that. I don't see how that addresses my question, though, why it's unreasonable for him to move to Illinois, continue to conduct his business with the computer and the Internet and the face, whatever, I forgot the terminology, I'm not really up on the tech stuff, and then make a trip a couple times, maybe, like I said, five or six times to Arkansas to get the face-to-face exchanges with his clients. I think the testimony of Mr. McNabb is different than what was summarized by the appellant in her argument. I'm actually using the summary you just gave me. I didn't hear any of those explanations actually address the point I'm trying to make. The bankruptcy... I'm sorry. No, go ahead. He did testify that he has received calls from clients where he would immediately have to go out within a day or two to personally meet with that person. They were expanding their business to video and he... Okay, he gets a call from a client, I need to see you tomorrow, it's absolutely critical. It's what, six hours? Better jump in the car and get down there if it's absolutely critical. To me, that's not unreasonable. It's more frequent than what... I mean, it could be four times a week that he would have to meet with a different client. Okay, now that's something new. The testimony is it could be four times a week? Because I thought it was more like four times a month. No. Two times a month. No. He testified that it was more frequent... There was a distinct definition and difference between what the GAL had reported in his report in the GAL's contact with the partner versus what Mr. McNabb testified to as the frequency. Plus he testified that his partner is in his home every day. They have personal one-on-one face contact to make issues with their business. So I don't think it's realistic and I don't believe that there was anything suggested that Mr. McNabb's testimony was not credible or reliable. He has been in this business, he's committed to these clients, and that would be put in jeopardy if he were to relocate to the state of Illinois. Was there anything in the record about income tax implications in moving from Arkansas to Illinois? The only thing in the record about income tax was his tax return as to what his income was for the prior year, but nothing as to the implication of changing from Arkansas to Illinois. Does that tax return reflect whether or not there is an income tax in Arkansas? An Arkansas income tax? I know we had the federal tax return as an exhibit. I'm not sure that the state tax return, if there was one, was an exhibit. I'm sorry, Your Honor. But this is where the issue falls, an appellant's major issue, I believe, is that, and she tried to distinguish it in the court, that it's a job. It's not a job. It's a business. It's his profession. And there is no testimony presented to the court as to his ability to come to Illinois, or if he even came to Illinois, if he could get such a comparable salary, set it up without putting the financial burden on it. Well, who had the burden of putting that testimony on? I believe that the testimony that was presented was sufficient by Mr. Knapp to indicate that that wasn't an option. The other thing, one of the factors that hasn't been addressed yet is that in the joint parenting agreement that the party signed in April of 08, there is a specific provision in it that says should either of the parties move more than 50 miles from this area, we shall share transportation for the children's visitation. There is the other provision in the agreement that says the house in Lexington must be sold. So the court relied upon, and its ruling stated, that if the parties intended, they knew that the house was going to be sold, so they knew the children would be uprooted from Lexington at some point in time. In the joint parenting agreement, they had the option, instead of saying beyond 50 miles, to say you can't go more than 50 miles. I mean, there is a condition that they could have restricted it because they knew the parties, the children would be moving from their base home. That was in the judge's docket entry? The restriction of saying that you can't move, that you can't, if you move more than 50 miles from the area, that you will share transportation. That is in the joint parenting agreement that the parties signed in April of 08. But Supe made no finding about that being there. He stated that in his reasoning, that was the basis because he believed that the parties anticipated that there would be a move more than 50 miles because that was stated in the joint parenting agreement. Now at the time the joint parenting was entered, she was not dating Mr. McMahon. That is correct. The issues that the court also addressed was that we had met all the factors that he felt was relevant when you consider the factors set forth in Eckert and Cowanborn. The benefit, obviously, to the children is indirect when there's a benefit also to the new spouse and her happiness of establishing a new family unit where there's a mother and father in the same household. She could return to being a stay-at-home mother, which is what she was prior to the divorce. She had a part-time job prior to the divorce, but it worked such that she was able to be home  be there when the children went to school. So she had a very flexible part-time job during the marriage. After the divorce or soon before the divorce, she did have to seek full-time employment. Now that she's married to Mr. McNabb, it is their goal to her, and she was, returning to a stay-at-home mom. So that is a benefit also that the court looked at. There would be a better financial situation. The wife's income was considerably low since she didn't have a long-standing history of work, and Mr. McNabb had a substantial income as proven by the tax return in the court record. We proved that the school system was better. There were more cultural opportunities in Arkansas than there were here. The court said that putting at risk the financial issues, he found that was not in the best interest of the children, and that was a factor that he considered. How fair is it to compare the opportunities in Lexington with a college community in Arkansas when everybody agreed that the home in Lexington was going to be sold, and it would be easy to locate in Bloomington Normal, which happens to be where the father was employed? There was testimony and exhibits also regarding the differences in the schools between Bloomington Normal, not just Lexington, and the state of Arkansas. I will admit that when you look on the webpages for these schools, it says you really can't compare the whole state of Arkansas to the whole state of Illinois, but that's the only testimony that was presented, and it was sufficient in the eyes of the court. But I'm not sure that you get to use cultural opportunities in the same sentence. Comparing Lexington to Jonesboro is not quite the same as comparing the Bloomington Normal area to Jonesboro in terms of universities, opportunities, gymnastics, athletics, extracurricular activities. At best, there's nothing to suggest that would be approved in Arkansas. There was no testimony from the appellant to the difference of what was offered here in Bloomington Normal versus what was offered in Jonesboro. So I think that was sufficient. I don't think that was a big factor in the eyes of the court in making this ruling. The counsel has argued that your client told the children it's either Cairo or Arkansas. Is that accurate? I don't think she used Cairo, but she indicated she probably would move to southern Illinois to be closer to her husband. Is that something that we should consider as we review this on appeal? And I guess as a follow-up, is that something the court proper considered in making this determination? You can consider anything that you deem is relevant, I believe, but I don't think that's a major factor in light of the fact that the property settlement agreement said she could move more than 50 months, and it was anticipated that might happen. You also have to understand that the GAL gave the children, when he interviewed them, a third option, and that they could stay in Lexington. That was never an option. So I think the GAL planted a seed in the minds of the children saying, well, you can move to Bloomington, you can move to Lexington, or stay in Lexington, or you can move to Arkansas. But it was a known factor that the house was going to be sold, and there was nothing in any of the agreements that says even after the house was sold, she had to stay in Lexington. So I think that is something the court needs to know about and consider as to what the GAL told the children. So did the condition here justify reopening the judgment? And she requested child support, correct? She requested an increase in child support, and that was denied by the court. The court found that his slight increase in income from his salary wasn't sufficient to justify it. He was also unemployed from his second job at the time of trial, which is William Masters, which he had been working at off and on since before the divorce, and just so happens that at the time of the hearing he was laid off or there wasn't sufficient income. But it was our argument that he did that also right before the judgment was entered in April of 2008 so that we wouldn't consider that income in child support. So the court did deny the petition for modification of child support based upon what the court said is due to his extra financial issues that he's incurring because of the issues of the order. With regard to the reopening, we had asked the court to authorize a lease of option to purchase, which the appellant was refusing to agree to. We had that in a pleading. Case law that I have cited to the court indicates that, first of all, the appellant did not file any motion to stay that or to dismiss it based on a jurisdictional issue. The revesting is an issue that is found in a couple of cases I cited before the court in Worry and Demond. And he actively participated in this testimony and in this request. He didn't do anything. In fact, he did present to the court another option, which is a different realtor, but the basis of that, he was under the belief that that realtor, Mr. Batol, I believe is his name, that he would purchase the property if it didn't sell after a period of time. But upon cross-examination, he hadn't talked to Mr. Batol, and when I questioned him about what are the conditions of Mr. Batol, the realtor, then buying your home, he wasn't aware that one of the parties had to buy a home from the same realtor to have him guarantee that he would buy their existing home. So that wasn't even an option. But the court indicated that both parties in its ruling, he wasn't doing either one, he didn't accept either proposal from either party, but he did modify with respect to, first of all, in the original property settlement agreement, my client had the opportunity to stay in the home, pay the utilities, pay the mortgage, pay the upkeep, etc., the repairs expenses, which they agreed upon, that would be split 50-50. When the house was sold, both parties would receive 50% of that proceed. During that time for the sale, she was allowed to deduct all the tax deductions incurred on the house that she could itemize on her income taxes. The court, in modifying or tweaking what the agreement said, basically said that the parties will now share the expenses starting January 1 of 10 until the house is sold. They will also share in the tax deductions. So it was a slight modification, and they're still going to share in the proceeds of the house when it's sold on a 50-50 basis. So it was a limited, and I think it's within the court's discretion, because they were still sharing some expenses in the agreement, they're still sharing the proceeds, and accordingly I think it was in the discretion, and since he did not object, he actively participated, he offered to the court a different option, I think it's appropriate what the court did in the modification. So is Ms. Mosby correct about the case law requiring some form of fraud before a modification under that statutory section? Not in the cases that were cited by Worry and DeMond. Both of those cases indicated that the court was revested with jurisdiction based upon, one, the parties actively participating in the proceedings, which were inconsistent with the merits of the prior judgment, and two, that the party did not object on jurisdictional grounds. And that is exactly what happened here. He didn't file an objection, he didn't ask for any type of motion to dismiss that portion of the pleading and not proceed with it. He actively testified and gave the court an option that he was hoping the court would adopt, and I think because of that he meets those revesting of jurisdictions issues. One other slight issue is that the timing of this, the property settlement agreement was signed in April of 2008, this petition was filed in February of 2009, so we're within the time limit provided by statute. Thank you, counsel. Thank you. Rebuttal? Ms. Wills-Biscott, there's no doubt that this case is heartbreaking, but how do we get over the standard of review? I think in this particular case that the standard of review is not an obstacle. Undoubtedly, it's an abuse of discretion standard against manifest way of the evidence. But in this particular case, I don't think that it is an obstacle. I think there is substantial facts, substantial case law, there's a substantial basis where it is, in my mind, it is easy to get over the standard of review. In this particular case, for example, Your Honor, if you look at the testimony of Mr. McNabb, I respectfully disagree with Ms. Smalley. For example, his testimony from the trial, he repeatedly says, I am not going to consider moving. I'm not going to uproot my children. I'm not going to move them from Arkansas. Specifically, he says, and I cited on page 23 of my report, but I give the court approximately 12 sites from the record where he says he will not consider moving to Illinois or working from Illinois. Additionally... You said that's on page 23 of your brief? Page 23 of my brief. And I give the court the sites from the volumes. He blatantly in court said, I am not going to do it. I'm not going to consider it. It is not an option. I won't do it. He also specifically, and I address this on page 21 and 22 of my brief, he says, this is what I do. I'm a 50% partner. My business involves working with art and creative, the art and creative side of the business. Chris is my partner. We work out of my home. Mark is the creator, service provider, and individual who maintains the website for the company. Mark being Mark McNamara. He says, I also manage the website. I look at the analytics that come out on the website. I firmly maintain that the information that I put on my website is accurate. And this is what his website says. And there are exhibits in the court file to show it. That I'm the geek guy. And my partner Chris is the go-to guy. The client contact guy. That's what their website says. He further testified that his website specifically says that Chris is the closest thing to an account executive. He's the hourly, daily, weekly, and monthly contact for each and every customer. I, meaning Mark, I'm the person who does the art director, designer, and graphic artist work. In his own words on the website, and I'm quoting, I'm the guy, the designer and graphic artist, since the dates of the Amberlith overlays and the X-Acto knives. A closest Apple Mac geek. Computer proficiency is a perfect match to my copy design and layout talents. I mean, he describes himself in a manner where he's the computer guy. He's the computer geek who does the work from home. How long have the children been in Arkansas now? They have been in Arkansas for less than one year. They have started, they finished the school year last year in Arkansas. Two semesters of college. It's somewhat established in that community. Is it still your argument it's in the best interest for them to now return after a year in Arkansas? Absolutely. To Illinois? Absolutely. They've not done a year in Arkansas. They have been there for approximately two academic semesters, and I absolutely believe, and I know the court is considering the evidence at the time of trial,  Is it your argument it would be legally incorrect for this court to consider their adjustment to Arkansas subsequent to the trial court's order? I think you can't consider adjustment to Arkansas. You cannot? I think you cannot. However, I think as a practical matter, they've lived. I mean, we have a child, the oldest child lived in Bloomington, Normal, for 14 years of her life. She's lived approximately, you know, nine months in Arkansas and the summer with her father. If we just as a practical matter apply common sense, you can't acclimate in six to nine months like you acclimated 14 years. Additionally, Your Honor, I would like to address the issue in regard to the joint parenting agreement when it was entered. The house was for sale when the joint parenting agreement was entered in April of 08. My client knew that the parties were going to move from the Lexington home. He had no idea that they were going to be moving to Arkansas. So anticipating a move in the same geographic area, and then anticipating your wife's going to solicit a mate on the Internet and move to Arkansas, is something very different. I'd also ask the court in my reply brief, I addressed the revesting issue. The case law cited is in regard to dependency allocation, not modifying a property settlement agreement. I also cited to the court the main case in my rebuttal brief that addresses the issues you inquired about in regard to Ms. Smalley, that specifically addresses case law on those particular issues. Thank you, Ms. Mosby. Ms. Scott will take this matter under advisement and recess until our 1 o'clock case.